# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

_____ )
                                                )

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:11-cr-00333-RB** |
| | ) | |
| **MIROSLAVA SHERMAN ANDRADA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| _____ | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

THIS MATTER comes before the Court on Defendant's Motion to Suppress. (Doc. 29.) Defendant requests that the Court suppress all evidence seized from her vehicle by law enforcement officers during the execution of a search warrant on October 8, 2010. Defendant asserts (**A**) that her continuing detention by law enforcement officers following a valid traffic stop was without reasonable suspicion; (**B**) that the seizure and subsequent search of her vehicle was without probable cause; (**C**) that Officer Alvarez unreasonably delayed in obtaining the search warrant; and (**D**) that the search warrant obtained for her vehicle was invalid because it contained material omissions, and without these omissions, it did not otherwise support a finding of probable cause. Having held an evidentiary hearing, carefully considered the parties' arguments, and otherwise being fully informed, the Court DENIES Defendant's Motion to Suppress.

## FINDINGS OF FACT

Federal Rule of Criminal Procedure 12(d) requires that the Court state its essential factual findings on the record when deciding a motion involving factual issues.  The Court therefore makes the following findings of fact based on the testimony presented at the evidentiary hearing held on May 31, 2011, the exhibits presented, including the DVD video of the traffic stop and investigatory detention recorded from the dashboard-mounted camera of Officer Christopher Alvarez' police cruiser, and those facts judicially noticed by the Court.

1.   On October 8, 2010, at approximately 2:20 p.m., Defendant Miroslava Andrada was traveling northbound on New Mexico Highway 80 in Hidalgo County, New Mexico in a white Lincoln Continental with Arizona license plates through a construction zone.  Officer Christopher Alvarez of the New Mexico Department of Public Safety, Motor Transportation Department (MTD), was traveling southbound.  Officer Alvarez observed Defendant's vehicle ahead of and traveling faster than the other cars as it came through the construction. Using his radar gun, Officer Alvarez determined that Defendant was traveling 63 m.p.h.  The speed limit in the construction zone was 55 m.p.h.  Officer Alvarez decided to perform a traffic stop.

2.   Officer Alvarez is an experienced officer, and in his eight years in law enforcement, he has performed hundreds of traffic stops.

3.   As Officer Alvarez had to turn around to perform the stop, it took him several minutes to catch up with Defendant.  Meanwhile, Defendant continued northbound on Highway 80, and then turned west onto Interstate 10 towards Willcox, Arizona.

4.   At the intersection of Highway 80 and Interstate 10 there is a gas station.  Defendant did not stop at the gas station.

5.      Officer Alvarez eventually caught up with and stopped Defendant at milepost 3 on Interstate 10.  Officer Alvarez approached the passenger-side window of Defendant's vehicle, informed Ms. Andrada that he stopped her because she had been speeding, and asked her to accompany him back to the front bumper of his police cruiser.

6.      Officer Alvarez recognized Defendant from a vehicle search he had assisted in a couple of months before.  Officer Johnston of the New Mexico State Police had requested that Defendant assist in a search of a green GMC Jimmy.  Officer Johnston had reliable information that the vehicle's owner was smuggling six kilograms of cocaine from Douglas, Arizona to Tucson, Arizona.  Ultimately, the officers did not find any contraband; however, Officer Alvarez remembered Defendant from this encounter.  Officer Alvarez had picked Defendant up from the side of the road and given her a ride to get some food while the other officers searched her car.

7.      Officer Alvarez inquired as to Defendant's destination.  Ms. Andrada indicated that she was headed to Willcox, Arizona to change her auto insurance policy and that she only intended to stay for the day.  Officer Alvarez found this suspicious because this type of transaction can generally be accomplished over the phone.

8.      Additionally, Officer Alvarez found Defendant's circuitous route of travel suspicious.  The most direct route for traveling between Douglas and Willcox is to take Highway 181, a trip of seventy-eight miles, which takes approximately one hour and twenty-five minutes to drive.  Highway 80, however, took Defendant very far to the east, across the Arizona state line into New Mexico, eventually running into Interstate 80.  Defendant then had to travel back west on Interstate 80 to Willcox, adding sixty miles (approximately one hour of driving time) to the overall length of her trip.

3

9.      Furthermore, Defendant's chosen route was suspicious because it bypassed all Border Patrol checkpoints and is a route frequently utilized by drug smugglers.  New Mexico Highway 80 originates in the border town of Douglas, Arizona, and then runs north through the sparsely populated "boot heel" of southwestern New Mexico.  This is a desolate area commonly used to smuggle drugs across the border into the United States, where they can be picked up in the desert and carried northward on Highway 80, which has no fixed Border Patrol checkpoints along its eighty-five mile length.   At its northern terminus, Highway 80 connects with Interstate 10, from which point, it can be taken northwest to Tucson, Phoenix, Los Angeles, or just about anywhere else in the United States, without ever having to pass through a Border Patrol checkpoint.  Accordingly, it is uncontested that Highway 80 is a well-known drug-smuggling route.

10.     Next, Officer Alvarez walked up to verify the VIN on the vehicle against that listed on the registration, at which point, he observed a suitcase in the back seat of Defendant's car.  Officer Alvarez found this inconsistent with Defendant's stated travel plans because it indicated that Defendant was going farther or staying longer than she had indicated.

11.     Defendant chatted nervously with Officer Alvarez throughout the stop, giving a particularly detailed answer about her insurance policy, informing Officer Alvarez about a friend who recently received a ticket with an electronic machine that printed the ticket out, and even volunteering information about what kind of fluoride rinse the officer should use.

12.     Officer Alvarez issued a citation, returned Defendant's documents, and informed her that she was free to go.  The entire traffic stop took approximately twelve minutes.  As Ms. Andrada walked toward her vehicle, Officer Alvarez called out after her to see if he could ask a few more questions about her trip.  Defendant stated that the transaction was

complete and she needed to go to the bathroom.

13.   Officer Alvarez persisted, stating again that he wanted to ask her some additional questions. At this point, Defendant's demeanor changed dramatically.  Defendant became noticeably upset and agitated, her voice was shrill, and she stated to Officer Alvarez that she did not want to answer any more questions about her trip because she had to go to the bathroom. This demeanor was markedly different from the chatty, genial attitude Ms. Andrada had exhibited up to that point.

14.   Officer Alvarez' demeanor was pleasant and even-toned throughout the encounter; accordingly, Defendant's reaction was not in response to any aggressive or intimidating behavior on his part.

15.   Officer Alvarez continued asking Ms. Andrada if she could answer some additional questions.  Defendant responded in a loud, shrill voice, "No. I have to go to the bathroom!" As Defendant was unwilling to answer any additional questions, Officer Alvarez informed her that she was not free to leave and requested that she go stand by the mile marker.

16.   Officer Alvarez then telephoned Officer Johnston.  Officer Alvarez stated, "I have that girl stopped."  At this point, Officer Alvarez cut the audio on his microphone, and the rest of the telephone conversation was not recorded.  Officer Alvarez, however, indicated that Officer Johnston did not relay any information to him concerning any present drug investigations involving Defendant.

17.   After his phone conversation with Officer Johnston, Officer Alvarez informed Defendant that he was going to have a canine unit come to the scene to perform a sniff of the vehicle. Officer Alvarez then called dispatch to locate the closest canine unit.

18.   While they were waiting for the canine unit to arrive, Defendant asked if she could get her

water out of her vehicle.  Officer Alvarez accompanied Defendant to retrieve her water bottle.  Defendant can be seen on camera taking numerous drinks of water over the next forty minutes, even though she indicted to Officer Alvarez she had to go to the bathroom.

19.     Approximately thirteen minutes after the initiation of the investigatory detention (or, about twenty-five minutes after the stop began), Officer Patrick Green of the Hidalgo County Sheriff's Department arrived with a canine unit.  Officer Green's dog, Gira, a nine-year-old female yellow lab, made three passes around the vehicle.  The sniff took approximately two minutes to complete.  As Gira was led around the car, on three different occasions, all at the right rear corner of the vehicle, she clearly paused and changed her body posture.  Gira did not, however, sit down.

20.     Officer Green then led Gira away from the vehicle to give her a break.

21.     Officer Green returned to the vehicle with Gira approximately nine minutes later.  As Gira passed by the trunk of the car, she once again paused and changed her body posture.

22.     Officer Green explained that an alert is defined as a change in body posture or an increase in respiration.  Still, most dogs, including Gira, are additionally trained to give a more obvious final indication.  As a final indication, Gira was trained to sit down.  After reviewing the video, Officer Green stated that Gira alerted on several occasions, as evidenced by her change in body posture, but she never gave a final indication.

23.     Officer Green stated that Gira may not have given a final indication due to a threshold problem that day, meaning that the odor was either stronger or weaker than Gira was accustomed to or trained to detect.  For instance, it was very windy at the time of the stop—the grass can be seen blowing, and there is considerable wind noise in the microphone—and this likely played a significant role in Gira not giving a final indication.

6

Interestingly, the wind was blowing out of the southwest that day (the prevailing wind direction in this region of the country), and each time Gira alerted she was on northeast side of the vehicle, sheltered from the wind and directly downwind from the drugs.

24. When Officer Green spoke with Officer Alvarez, rather than state that Gira alerted, he indicated only that she had shown interest in the trunk area of the vehicle. Therefore, the Court finds that Gira did alert to the vehicle several times, but this information was never conveyed to Officer Alvarez.

25. While Gira performed a sniff of the car, Officer Alvarez contacted the El Paso Intelligence Center (EPIC) and learned that Ms. Andrada was a suspect in four active investigations by the Tucson Drug Enforcement Administration. EPIC serves as a clearinghouse for information and intelligence gathered from multiple law enforcement and intelligence agencies. Law enforcement officers routinely rely on information they receive from EPIC when making traffic stops or performing investigatory detentions. *United States v. Marquez-Diaz*, 325 Fed. App'x. 637, 640–41 (10th Cir. 2009); *United States v. Acosta-Chavez*, 1998 WL 421822, at *1 n. 1 (10th Cir. July 27, 1998).

26. Officer Alvarez approached Defendant and advised her that the canine had shown interest in the trunk area of the vehicle, and that he therefore wished to search the vehicle. Ms. Andrada indicated to Officer Alvarez that he could search the vehicle's trunk. Officer Alvarez, however, stated that he wished to search the entire vehicle as the odor could be originating from anywhere, not just the trunk area. Officer Alvarez read the consent to search form to Defendant and asked if she would consent to a search. Defendant indicated she would not consent to a search of the vehicle.

27. Officer Alvarez asked Defendant if she had any drugs in her vehicle. Defendant answered

that she had a bunch of legal drugs.  Officer Alvarez asked if she had any illegal drugs.

Defendant paused and did not answer.

28.     Officer Alvarez believed—based on what he had observed, in addition to the canine's

interest in the vehicle—that he had probable cause to seize the vehicle, have it towed to the

MTD office in Lordsburg, New Mexico, and apply for a search warrant.  Officer Alvarez

therefore went back to his car to contact Hidalgo County Assistant District Attorney Gerald

Byers, who agreed that there was enough information to obtain a search warrant.

29.     Another officer arrived to transport Ms. Andrada to a restroom and then to the MTD office

in Lordsburg until a warrant could be obtained and a search of her vehicle completed.  A tow

truck transported Defendant's vehicle to the MTD office.

30.     At the MTD office in Lordsburg, Officer Alvarez prepared an affidavit for a search warrant.

As the basis for probable cause, Officer Alvarez listed the following factors:

> -Ms. Andrada was traveling from Dougals, AZ to Willcox, AZ by a route that
> would take her approximately one hour out of her way.
> -This route is commonly used to avoid border patrol checkpoints.
> -Ms. Andrada indicated that she was traveling to Willcox to change her
> insurance policy and would be returning to Douglas the same day.  This
> seemed unusual, when such a transaction could be accomplished by phone.
> -Ms. Andrada had a suitcase in the back seat, indicating that she was
> traveling farther or planning to stay longer than she had indicated.
> -Ms. Andrada's behavior changed dramatically when asked if she could
> answer some additional questions about her trip, and she wanted to leave
> much more than an innocent motorist.  She became very nervous and started
> to slur her speech to the point it was difficult to understand her.
> -From prior experience, Officer Alvarez knew that she was the subject of
> many high-level DEA investigations.  Additionally, after contacting EPIC,
> Officer Alvarez discovered that the DEA had four active cases on
> Ms. Andrada and offered the names of the case agents.
> -A trained drug dog showed interest in the trunk of Ms. Andrada's vehicle.
> -Ms. Andrada consented to a search of the trunk after the canine showed
> interest in it, but she refused to give consent to a search of the entire vehicle.
> -Ms. Andrada indicated that she had legal drugs in her vehicle, but when
> asked about illegal drugs, she took a long pause and did not answer.

8

Doc. 39-1 (paraphrasing, not quoting).

31.     Officer Alvarez faxed the affidavit to New Mexico District Judge Gary Jeffreys of the Sixth

Judicial District Court, who approved the warrant and faxed it back to Officer Alvarez at

approximately 7:19 p.m.

32.     During the search of Defendant's vehicle, Officer Alvarez encountered a small tan and black

toiletry bag on the front floorboard of the driver's side.  Inside the bag he discovered four

kilo-size bricks wrapped in brown packing tape.  Officer Alvarez cut one of the bricks open

with a knife and found a white powder inside, which tested positive for cocaine.

## CONCLUSIONS OF LAW

**A.     Continuation of Traffic Stop to Conduct Canine Sniff of Vehicle for Suspected Presence of Drugs Was Based on Reasonable Suspicion of Illegal Activity**

1.      Defendant does not contest the validity of the initial traffic stop. (Doc. 29 at 3.)

Furthermore, as the stop took only twelve minutes to complete—despite Defendant's

numerous questions and long, detailed explanations—the Court concludes that the initial

stop was reasonable. *See United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995)

("a traffic stop is valid under the Fourth Amendment if the stop is based on an observed

traffic violation" ); *United States v. Lyons*, 510 F.3d 1225, 1236 (10th Cir. 2007) ("A seizure

that is justified solely by the interest in issuing a warning ticket to the driver may become

unlawful if it is prolonged beyond the time reasonably required to complete that mission.").

2.      Further detention and questioning beyond that needed to issue the citation is permissible

only if: "(1) during the course of the traffic stop the officer acquires an objectively

reasonable and articulable suspicion that the driver is engaged in illegal activity or (2) the

driver voluntarily consents to the officer's additional questioning." *United States v.*

*Sandoval*, 29 F.3d 537, 540 (10th Cir. 1994) (internal citations omitted); *see also United States v. Lyons*, 510 F.3d 1225, 1237 (10th Cir. 2007).  Defendant clearly did not consent to extending the stop; therefore, for Ms. Andrada's continued detention to be lawful, Officer Alvarez must have held an objectively reasonable suspicion of criminal wrongdoing. *See United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009) ("The traffic stop may 'be expanded beyond its original purpose . . . if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " (quoting *United States v. Villa-Chaparro*, 115 F.3d 797, 801–02 (10th Cir. 1997))); *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998); *United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005) ("An officer may detain a motorist for questioning unrelated to the initial traffic stop if he has an objectively reasonable and articulable suspicion that illegal activity has occurred . . . .").

3.  "Reasonableness, of course, depends on a balance between the public interests and the individual's right to personal security free from arbitrary interference by law officers." *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (internal quotation omitted); *see also United States v. Cheromiah*, 455 F.3d 1216, 1221 (10th Cir. 2006).  This requires the Court to "look at the totality of the circumstances of each case to see whether the detaining officer [had] a particularized and objective basis for suspecting legal wrongdoing." *United States v. Quintana-Garcia*, 343 F.3d 1266, 1269 (10th Cir. 2003) (internal quotations omitted); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).  At the time Officer Alvarez detained Defendant, he was aware of the following factors contributing to a finding of reasonable suspicion: (i) Defendant had an out-

of-state license plate; (ii) Defendant had been the subject of a previous investigation for suspicion of drug smuggling; (iii) Defendant's explanation that she was traveling to Willcox to change her auto insurance was suspicious because this type of transaction can be accomplished by telephone; (iv) Defendant's circuitous route of travel was suspicious, as it added approximately one hour to the overall length of her trip; (v) Defendant's chosen route of travel was also suspicious because it is a common drug-smuggling route north from the U.S.-Mexico border used to bypass Border Patrol checkpoints; (vi) Defendant had a suitcase in the back seat of her vehicle, which was inconsistent with her statement that she planned to return home that day; (vii) Defendant chatted nervously with Officer Alvarez throughout the stop, gave prolonged and detailed answers to questions, and even engaged in unsolicited conversation, all despite her stated need to go to the bathroom; and (viii) Defendant became extremely upset when Officer Alvarez calmly asked if she could answer some additional questions about her trip, responding in a loud, shrill voice, "No. I have to go to the bathroom!"  Considering the totality of the circumstances, the Court concludes there was reasonable suspicion to justify a brief investigatory detention beyond the initial traffic stop.

4.    Similar factors have been cited by the Tenth and other circuits as consistent with a finding of reasonable suspicion or probable cause. *See, e.g.*, *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) (proximity to border and driver's behavior); *United States v. White*, 584 F.3d 935, 950–51 (10th Cir. 2009) (nervousness and route of travel); *United States v. Powell*, 277 Fed. App'x. 782, 787 (10th Cir. 2008) ("Under our governing authority, an apparent (even if conceivably explicable) inconsistency between the stated purpose of a trip and the amount of luggage being transported may contribute to reasonable suspicion that illegal activity is afoot"); *Cheromiah*, 455 F.3d at 1221–22 ("encountered the van only 85

11

miles from the border in an area frequented by smugglers"); *Williams*, 271 F.3d 1262 (continued nervousness throughout stop); *United States v. Beck*, 140 F.3d 1129, 1139 (8th Cir. 1998) (unusual or suspicious travel plans); *United States v. Wood*, 106 F.3d 942, 946–47 (10th Cir. 1997) (unusual travel plans); *United States v. Kopp*, 45 F.3d 1450, 1453–54 (10th Cir. 1995) (suspicious travel plans); *United States v. Barbee*, 968 F.2d 1026, 1029 (10th Cir. 1992) (out-of-state licence plates); *United States v. Leyba*, 627 F.2d 1059, 1064 (10th Cir. 1980) (out-of-state plates, even from a nearby state, are "entitled to some limited consideration").  The Court concludes that these same factors contribute to a finding of reasonable suspicion in the case at hand.

5.     Defendant argues that the facts of this case are not sufficient to establish reasonable suspicion, and that they are far less suggestive of illegal activity than the facts of *United States v. Simpson*, 609 F.3d 1140, 1153 (10th Cir. 2010), where the Tenth Circuit found it a "close call" as to whether the officer had a reasonable suspicion that criminal activity was afoot. (Doc. 29 at 4.)  Indeed, there are many similarities between this case and *Simpson*, and if viewed in isolation, the individual factors in the case at hand are not sufficient to provide reasonable suspicion; however, the Court "may not evaluate and reject each factor in isolation," as the "Supreme Court has expressly rejected this sort of 'divide-and-conquer' analysis." *Williams*, 403 F.3d at 1207.  Where this case differs from *Simpson* is in the sheer number of factors that led Officer Alvarez to conclude that he possessed reasonable suspicion of criminal wrongdoing to continue his investigation.  Consequently, the Court rejects Defendant's argument that the facts in the case at hand were less suggestive of criminal wrongdoing than those presented in *Simpson*.

6.     Furthermore, the Court's totality of the circumstances analysis "is made from the perspective

of the reasonable *officer*, not the reasonable *person*," *Quintana-Garcia*, 343 F.3d at 1270, as an "officer is entitled to assess the facts in light of his experience." *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975). This "experience and specialized training" allows officers "to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (internal quotations omitted); *see also Cortez*, 449 U.S. at 418. In the case at hand, Officer Alvarez was an experienced officer who had made thousands of traffic stops during his career. Officer Alvarez was also familiar with the area and the high incidence of drug-smuggling activities that took place on this particular stretch of highway due to its remoteness, close proximity to the U.S.-Mexico border, and lack of Border Patrol checkpoints. These are important factors that were not present in *Simpson*. In *Simpson*, 609 F.3d at 1152 n. 3, the Tenth Circuit stated that it gave "no credence" to the officer's assertion that Interstate 80 in northern Utah was a "drug corridor." In the case at hand, however, where the stop occurred approximately eighty-five miles from the U.S.-Mexico border on what has been consistently recognized as a well-known drug smuggling route, the Court concludes that it must give considerable credence to the experience and specialized training of the officers who patrol this area on a daily basis and are familiar with the habits and practices of the drug traffickers in the area.

7.      Finally, in order for an investigatory detention to be reasonable, it must not be longer than necessary for the officer to confirm or dispel his suspicions, and the methods used must be the "least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983). "The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests

13

warrant a limited intrusion on the personal security of the suspect." *Id.*  In the case at hand, it took approximately thirteen minutes for the officer to arrive with the canine unit and an additional two minutes to conduct the sniff.  A canine sniff is clearly "much less intrusive than a typical search," *United States v. Place*, 462 U.S. 696, 706 (1983), and the time it took for Officer Alvarez to summon a dog and perform the sniff only delayed Defendant an additional fifteen minutes.  As Ms. Andrada had refused to answer any additional questions about her trip—which would have been an alternative investigative technique—the only other option available to Officer Alvarez was to summon a canine unit.  Accordingly, the Court concludes that the investigatory detention was reasonable because it utilized the least intrusive means of investigation reasonably available and detained Defendant very briefly.

**B.**    **Seizure of Defendant's Vehicle to Obtain a Search Warrant Was Based on Probable Cause of Criminal Activity**

8.    The prolonged seizure of Defendant's car in the case at hand could not by justified on reasonable suspicion alone; therefore, at some point during the detention, probable cause must have arisen, or the seizure constituted a Fourth Amendment violation. *United States v. West*, 219 F.3d 1171, 1178 (10th Cir. 2000).  Generally, probable cause exists if "under the totality of the circumstances there is a fair probability that the car [to be searched] contains contraband or evidence." *United States v. Jurado-Vallejo*, 380 F.3d 1235, 1238 (10th Cir. 2004); *see also United States v. Ledesma*, 447 F.3d 1307, 1316 (10th Cir. 2006). In addition to the factors giving rise to reasonable suspicion discussed above, the following factors contributed to a finding of probable cause: (i) Officer Alvarez was informed by Officer Green that his drug dog showed interest in the trunk area of the vehicle; (ii) Officer Alvarez was informed by EPIC that Defendant was a suspect in four active drug

investigations, and (iii) Defendant failed to respond when asked if there were any illegal drugs in the vehicle. Based on the totality of the circumstances, the Court therefore concludes that Officer Alvarez had sufficient information to prolong the seizure in order to obtain a warrant.

9. By itself, an alert from a trained drug dog is sufficient to establish probable cause. *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009) ("[T]he general rule we have followed is that a dog's alert to the presence of contraband is sufficient to provide probable cause. We decline to adopt the stricter rule urged by [defendant], which would require the dog to give a final indication before probable cause is established."); *United States v. Forbes*, 528 F.3d 1273, 1277 (10th Cir. 2008) ("a canine's alert to the presence of contraband during an exterior sniff of a vehicle gives rise to probable cause"). In the case at hand, however, Officer Alvarez was only informed that the dog "showed interest" in Defendant's trunk. Although the Court found that Gira did alert to the presence of drugs in the vehicle, this information was not relayed to Officer Alvarez. In making its determination of whether Officer Alvarez' probable cause determination was objectively reasonable, the Court must focus solely on those facts and circumstances of which the officer had personal knowledge. *Ledesma*, 447 F.3d at 1316. Accordingly, the Court cannot find that Officer Alvarez possessed probable cause based only on Gira's alert. Rather, it may consider the fact that Gira "showed interest" in the trunk as one of several factors supporting probable cause. *See United States v. Guzman*, 75 F.3d 1090, 1096 (6th Cir. 1996) (concluding that dog's interest can be considered in totality of the circumstances analysis).

10. Officer Alvarez additionally knew, based on information he received from EPIC, that Defendant was a suspect in four active drug investigations. While the information from

EPIC did not specifically indicate that Defendant was transporting drugs on this particular day, the Court concludes that the fact she was a suspect in four active drug investigations is an additional factor that it may consider in its totality of the circumstances analysis. *See Simpson*, 609 F.3d at 1147; *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997).  The Tenth Circuit has cautioned against placing substantial weight on a suspect's prior criminal involvement; however, it is one factor that may be considered in the totality of the circumstances calculus. *Id*.  Moreover, in contrast to *Simpson* and *Wood*, the information relayed to Officer Alvarez was that Defendant was a suspect in four *active* drug investigations.  This may give more impact to the information, when compared to a prior investigation or criminal conviction. Ultimately, due to the numerous other factors contributing to probable cause, the Court does not have to put considerable stock in this one factor; nevertheless, it does consider it as a factor in its totality of the circumstances analysis.

11.     In conclusion, considering the totality of the circumstances, including the reasonable suspicion factors discussed in the preceding section, plus the fact that Officer Alavarez was informed that Gira showed interest in the trunk area of the vehicle, the information obtained by Officer Alvarez through EPIC, and the fact that Defendant did not respond when asked if there were illegal drugs in her vehicle, the Court concludes that Officer Alvarez' determination that probable cause existed to seize the vehicle in order to obtain a search warrant was objectively reasonable.

**C.     Officers Did Not Unreasonably Delay in Obtaining Search Warrant**

12.     "[E]ven a seizure based on probable cause is unconstitutional if police act with unreasonable delay in securing a warrant."  *United States v. Martin*, 157 F.3d 46, 54 (2d Cir.1998).  "The reasonableness of the delay is determined 'in light of all the facts and circumstances,' and

16

'on a case-by-case basis.' " *United States v. Mitchell*, 565 F.3d 1347, 1351 (11th Cir. 2009) (quoting *United States v. Mayomi*, 873 F.2d 1049, 1054 n. 6 (7th Cir. 1989)).  Considering the remoteness of the location and the time it took Officer Alvarez to get a drug dog and then tow the vehicle back to Lordsburg, in addition to the time it normally takes to type an affidavit and get the warrant approved and signed by a judge, the fact that it took five hours to obtain a warrant and search the car, from the time of the initial traffic stop, does not constitute an unreasonable delay. *See United States v. Lux,* 905 F.2d 1379, 1382 (10th Cir. 1990) (concluding that a delay from Saturday until Monday to obtain a warrant for a package was not unreasonable); *Mills v. Merrimack Police Dept.*, 2004 WL 1013380, at *4 (D.N.H. May 5, 2004) (concluding that a delay of four days in obtaining a warrant for a vehicle was not unreasonable).

**D.     The Search Warrant Did Not Include False or Misleading Statements Such That, If Excised, the Affidavit Would No Longer Support a Finding of Probable Cause**

13.     "A search warrant must be voided and the fruits of the search suppressed where a court (1) finds that the affiant knowingly or recklessly included false statements in or omitted material information from an affidavit in support of a search warrant and (2) concludes, after excising such false statements and considering such material omissions, that the corrected affidavit does not support a finding of probable cause." *United States v. Garcia-Zambrano*, 530 F.3d 1249, 1254 (10th Cir. 2008) (citing *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)).  The Court concludes (i) that the inclusion of the statement in the affidavit that the drug dog showed interest in the trunk did not constitute a false statement, and (ii) that the exclusion of the statement that the drug dog did not fully alert and/or give a final indication was not knowingly or intentionally misleading.  Officer Alvarez simply stated in the

17

affidavit that the dog handler advised him that the canine showed interest in the trunk. Ultimately, this statement was not false or misleading because the Court found that the dog did alert to the presence of drugs.  While this fact was not conveyed to Officer Alvarez—out of what would seem an abundance of caution on the part of the handler—Officer Green had no doubt that his dog was picking up a drug odor from the car, and the affidavit does not misrepresent or overstate this fact.  If anything, the affidavit minimizes the dog's reaction. The Tenth Circuit has clearly stated that it is not necessary for a canine to give a final indication for there to be a finding of probable cause. *Parada*, 577 F.3d at 1282 ("We decline to . . . require the dog to give a final indication before probable cause is established.").  Accordingly, even if the affidavit had stated that the dog alerted to the car, this would not have been a false statement; nor was it misleading to omit the fact that the dog did not give a final indication, as this is not required for a finding of probable cause.

## ORDER

**WHEREFORE**, the Court hereby **DENIES** Defendant's Motion to Suppress. (Doc. 29.)

_____
ROBERT BRACK
UNITED STATES DISTRICT JUDGE